IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

| | | |
|---|---|---|
| LARRY DEPEW | * | |
| and | * | |
| FRANCIS SPOKUS, | * | |
| Plaintiffs. | * | |
| v. | * | Civil Case No. 15-03080-JMC |
| MOBILE DREDGING AND PUMPING COMPANY | * | |
| and | * | |
| CARYLON CORPORATION | * | |
| Defendants. | * | |

* * * * * * *

## MEMORANDUM OPINION

Plaintiffs, Mr. Larry Depew and Mr. Francis Spokus (collectively, "Plaintiffs"), filed their complaint in this Court, on October 9, 2015, against Defendants, Mobile Dredging and Pumping Company ("Mobile") and the Carylon Corporation ("Carylon") (collectively, "Defendants"), alleging that they were not properly compensated for hours worked in violation of Fair Labor Standards Act of 1938, as amended, 29 U.S.C. §§ 201, *et seq.* ("FLSA"), the Maryland Wage and Hour Law, Maryland Code Annotated, Labor and Employment Article §§ 3-401, *et seq.* ("MWHL"), and the Maryland Wage Payment and Collection Act, Maryland Code Annotated, Labor and Employment Article §§ 3-501, *et seq.* ("MWPCL"). The parties consented to proceed before a magistrate judge pursuant to 28 U.S.C. § 636(c) and Local Rule 301.4. (ECF Nos. 8, 10, 11, 13). Now pending before the Court is Defendants' "Motion for Summary Judgment, or in the alternative Motion to Dismiss." (ECF No. 33). In deciding that motion, the

Court has also considered Plaintiffs' Response in Opposition and Defendants' Reply, and a hearing was held on April 11, 2017. (ECF No. 36, 37, 38, 40). For the reasons that follow, Defendants' motion is GRANTED IN PART and DENIED IN PART.

## I.  Background

Mobile is an "environmental services contractor" based in Chester, Pennsylvania that provides "sewer cleaning, industrial cleaning, sediment and sludge dredging, and dewatering services." VETTER DEP. at 13 (ECF Nos. 33-3, 36-2, 37-7). Mobile is a subsidiary of Carylon, a privately-held corporation that owns environmental service contractors. VETTER DEP. at 17-18.[1] From 2008 to 2015, Plaintiffs were, at various and overlapping periods, employees of Mobile. Mr. Depew, who at all times relevant to this litigation lived in Dundalk, Maryland, worked for Mobile from October 2008 to June 2015. DEPEW INTEROG. ANS. NO. 2 (ECF No. 33-10); DEPEW DEP. at 25, 95 (ECF Nos. 33-5, 36-3, 37-4).[2] Mr. Spokus, also a resident of Dundalk, Maryland, worked for Mobile from June 2011 to April 2015. SPOKUS INTEROG. ANS. NO. 2 (ECF No. 33-11); SPOKUS DEP. at 11-12, 18-19 (ECF Nos. 33-4, 36-4, 37-5). At different times during the course of their employment with Mobile,[3] Plaintiffs worked as either "laborers" or "operators."[4]

---

[1] The exact relationship between Carylon and Mobile is the focus of Defendants' argument to dismiss Carylon from this case, and  will be discussed in greater detail below.

[2] Mr. Depew left Mobile for a brief period of time in 2010 (roughly sixty days) but would later return to the company. His brief absence is not relevant to the merits of this motion. DEPEW DEP. at 26-28.

[3] The Court cannot determine precisely which dates Plaintiffs were laborers and operators, though it appears that Mr. Depew was a laborer for Mobile from 2008 to 2011, and was later promoted to operator which he served as from 2012 to 2015. DEPEW DEP. at 25, 36. Mr. Spokus worked as a laborer for some or all of his time at Sparrows Point, but was later promoted to operator from 2012 to 2015. SPOKUS DEP. at 28.

[4] Although the distinction between laborer and operator is not essential to the resolution of the pending motion, the Court notes that the deposition testimony offered into the record contains various descriptions of the roles and responsibilities of laborers and operators. Generally, it appears that the laborer would be responsible for assisting the operator by loading the needed equipment into the truck and then would help work the equipment as directed by the operator, who held the more managerial position. DEPEW DEP. at 25; SMITH DEP. at 34 (ECF Nos. 33-7, 36-5, 37-2).

From 2012 to 2015, the relevant time period in this case, Plaintiffs were employed as operators.[5] DEPEW DEP. at 25, 36; SPOKUS DEP. at 18-19, 26. This position generally required Plaintiffs to be present at the jobsite, speak with the customer about any concerns and expectations relating to the ongoing work, inspect the vehicles and equipment, and ensure that the crew had all the necessary tools to complete the job. DEPEW DEP. at 25, 37, 50-51, 105, 107; SPOKUS DEP. at 62, 65, 67. Plaintiffs, themselves, would also operate the equipment and vehicles to complete whatever project they were working on. DEPEW DEP. at 25, 37, 50-51, 105, 107; SPOKUS DEP. at 62, 65, 67. Plaintiffs' supervisor at Mobile, Mr. David Smith, testified that Plaintiffs would "take the truck to the site, help hook up the hoses, engage the blowers to make the trucks work, fill the water pumps to make the water blasters work. And then . . . they would operate the water blaster themselves, unless they had a qualified second man on the truck to do the water blasting." SMITH DEP. at 34. In addition to these duties, Plaintiffs obtained, at Mobile's request, Commercial Drivers Licenses ("CDLs") so that they could drive large commercial vehicles on behalf of Mobile. SPOKUS DEP. at 33, 36; DEPEW DEP. at 45. Plaintiffs obtained these licenses before their transfer from Baltimore to Washington D.C., described below.

A central issue in the pending motion for summary judgment is the change in Plaintiffs' jobsite location, and whether that change imposed additional, compensable work obligations upon Plaintiffs for which they were not paid. When Plaintiffs began their employment with Mobile, in 2008 and 2011 respectively, they were working at the Bethlehem Steel/RG Steel ("Bethlehem Steel") facility located at Sparrows Point in Baltimore, Maryland. At that time, Mobile had a long-term contract to provide industrial cleaning services at the Sparrows Point facilities. VETTER DEP. at 34 (ECF Nos. 33-3, 36-2, 37-7). However, when Bethlehem Steel went

---

[5] There appear to have been a few months in 2012, shortly after Mr. Spokus was transferred to Blue Plains, when he worked as a laborer. SPOKUS DEP. at 62.

out of business, Mobile entered into a contract to provide industrial cleaning services at Blue Plains Advanced Water Treatment Facility, ("Blue Plains"), located in Washington D.C. SPOKUS DEP. at 36; VETTER DEP. at 34. Despite losing the contract with Bethlehem Steel, Plaintiffs continued their employment with Mobile and were required to commute from the Baltimore area to the Blue Plains facility.

From 2012 to 2015, Plaintiffs commuted from Sparrows Point to Blue Plains, and it is this period of employment with Mobile that is the focus of the present motion. However, the exact timeline and details of this commute are not entirely clear from the record. Mr. Depew testified at his deposition that, upon the closing of Bethlehem Steel, he was transferred or "told to report" to the Blue Plains facility in February or March of 2012. DEPEW DEP. at 100. Mr. Depew noted that for his first day at the Blue Plains facility, he was instructed by Mr. Smith to "get with" Mr. Spokus at a small facility nearby Sparrows Point where Mobile kept some of its vehicles and equipment. SPOKUS DEP. at 76; DEPEW DEP. at 103. Once there, they would use "the company truck" to travel to Blue Plains together. DEPEW DEP. at 100-101. Mr. Depew stated that this is how he, Mr. Spokus, and several other Mobile employees[6] commuted to Blue Plains.[7] Mr. Depew further added that he almost exclusively used company vehicles to commute to and from Sparrows Point and Blue Plains, and only on "very rare" occasion would he drive his personal vehicle to Blue Plains directly. DEPEW DEP. at 108. In fact, Mr. Depew testified that he generally did not have the option of driving his personal vehicle to Blue Plains, rather, he was "told to

---

[6] Mr. Depew and Mr. Spokus would generally meet Chad Weeks and Andrew Payton for this commute as well. SPOKUS DEP. at 87.

[7] It is unclear from the record whether Plaintiffs always met at the same Sparrows Point facility from 2012-2015, or whether they changed "lots" or "facilities" during this time. Similarly, it appears that Mr. Depew suffered an injury during this time period that kept him from work for a prolonged period of time, though it in unclear exactly how long he was away from work. Nevertheless, these factual ambiguities are not essential to the resolution of this motion.

report" to the Sparrows Point facility to get the company truck and equipment. DEPEW DEP. at 108-109.

Mr. Spokus's deposition testimony, however, offers a slightly different account. He testified that he began at Blue Plains in September of 2012, five to six months after Mr. Depew's start at the Washington D.C. facility. SPOKUS DEP. at 73. Mr. Spokus noted that for the first few weeks of this commute, he used a company truck that was located at a Mobile owned parking lot near Sparrows Point. SPOKUS DEP. at 73-73, 76. However, after a few weeks of this, Mr. Spokus was required to drive his own personal vehicle from his house directly to the Blue Plains facility. SPOKUS DEP. at 77. Eventually, after some period of time commuting this way, Mr. Spokus complained about the commute to his supervisors, (SPOKUS DEP. at 78-79), prompting them to provide a different method of commute for their employees making this trip.[8] As a result, Mr. Spokus, Mr. Depew, and several others would meet in the mornings at a facility located at Sparrows Point, where they would drive a company vehicle from Sparrows Point to Blue Plains. SPOKUS DEP. at 77-78, 82-83.

Regardless of these discrepancies, both Plaintiffs contend that for a significant period of time, at least from 2013 to 2015, they, along with the other Mobile employees, would meet in the mornings at Sparrows Point and travel to Blue Plains using a company vehicle that they loaded with Mobile equipment that would be used in the cleaning process at Blue Plains. Plaintiffs would generally drive one of several different vehicles that were stored at Mobile's facility at Sparrows Point, including a "Guzzler," a "Hydro," and a "Stakebody truck."[9] SPOKUS DEP. at

---

[8] For instance, Mr. Vetter testified that "[Mobile] obtained that [Sparrows Point lot] after the plant closed just as a base for the employees who used to work at Sparrows Point . . . to meet and go to work at [Blue Plains] from Baltimore, from the Sparrows Point area." VETTER DEP. at 34.

[9] The Court is unable to glean from the record exactly: what kinds of trucks and vehicles were stored at Sparrows Point, how many there were of each, and how often Plaintiffs drive each of those vehicles from Sparrows Point to

111; DEPEW DEP. at 127. The work equipment and tools that they would load into the vehicle and transport each day would include such things as oil, fluids, hoses, piping, shovels, picks, and squeegees that were stored at Mobile's facility at Sparrows Point. SPOKUS DEP. at 135-136. The particular vehicles, equipment, and tools that Plaintiffs would transport each day were communicated to them the day prior by their supervisor, Mr. Smith. DEPEW DEP. at 251.

Specifically, as it related to which vehicle would be brought down from Sparrows Point to Blue Plains, Mr. Smith testified as follows at his deposition:

> [Counsel] Did you ever request a [utility truck equipped with a fuel cell] to be transported from the Baltimore area to the Blue Plains facility?
>
> [Mr. Smith] Always.
>
> [Counsel] Okay. And why is that?
>
> [Mr. Smith] That's how we fueled up all our equipment.
>
> [Counsel] Okay. Did Mr. Depew ever drive the utility truck or the fuel cell?
>
> [Mr. Smith] Yes.
>
> [Counsel] And why would he – why did he do that?
>
> [Mr. Smith] They rotated. One would drive in the morning. And one would drive in the evening.
>
> * * *
>
> [Counsel] Okay. All right. To your knowledge, did Larry Depew ever drive a company vehicle from Sparrows Point to the Blue Plains facility without your knowledge?
>
> [Mr. Smith] No.

---

Blue Plains. Mr. Depew testified that there were "at least two guzzlers," a "hydro," and "two stake body trucks." DEPEW DEP. at 127. Mr. Spokus, however, testified that there were "three utility vehicles, [a] hydro, and [a] Guzzler." SPOKUS DEP. at 111. And elsewhere in the deposition testimony, the vehicles driven from Sparrows Point to Blue Plains seem to include: "Guzzler," "Vactor," "Hydro," "Jetter," "JC unit," and "Stakebody." SPOKUS DEP. at 67, 72-73, 103, 106.

[Counsel] Did Mr. Depew ever drive a company vehicle from Sparrows Point to Blue Plains without your request?

[Mr. Smith] No.

[Counsel] . . . And when Mr. Depew drove whatever vehicle he drove that day to the Blue Plains facility, was it used by the workers, Mobile Dredging workers? Was it used at the Blue Plains facility?

[Mr. Smith] Yes, to do the work.

SMITH DEP. at 41, 45. And, as it related to the tools and equipment that Mr. Smith instructed Plaintiffs to transport from Sparrows Point to Blue Plains each day, Mr. Depew testified as follows:

[Counsel] But every day, you would load your fuel cell?

[Mr. Depew] Fuel up, yes. It was required.

[Counsel] Now the equipment, the tools that you loaded up on the truck, was that your property?

[Mr. Depew] No. It was Mobile Dredging's.

[Counsel] Were you told what equipment to bring each day from Sparrows Point to Blue Plains?

[Mr. Depew] Usually, at the end of day, prior to.

[Counsel] And who would tell you what to bring?

[Mr. Depew] Dave Smith.

[Counsel] And who would tell you what vehicle to bring from Sparrows Point to Blue Plains?

[Mr. Depew] Dave Smith.

DEPEW DEP. at 251.

In addition to transporting these things, Plaintiffs were instructed to bring down fuel in the mornings that would be used to run the equipment at Blue Plains. SPOKUS DEP. at 155. They

were also required to conduct pre-trip and post-trip safety inspections of the company vehicles each day and record their condition. SPOKUS DEP. at 85; DEPEW DEP. at 146-148.

Plaintiffs would generally meet at Sparrows Point at 4:45 am to load the vehicle and would leave by 5:30 am in order to arrive at Blue Plains by their 6:45 am required start time. DEPEW DEP. at 105-07.[10] And they would spend roughly the same or shorter amount of time in the evenings unloading the truck once they returned to Sparrows Point. DEPEW DEP. at 160. In all, Plaintiffs would spend between ten and thirty minutes each day at Sparrows Point inspecting their vehicles as well as loading and unloading the necessary equipment and tools. SPOKUS DEP. at 114. A one-way trip between Sparrows Point and Blue Plains could range anywhere between one and a half to four hours depending on weather and traffic conditions. SPOKUS DEP. at 111.

Plaintiffs were both considered full-time hourly employees of Mobile between 2012 and 2015. SMITH DEP. at 34; SPOKUS DEP. at 126; DEPEW DEP. at 109-110. During that time frame, Mr. Spokus earned between $17.82 and $18.82 per hour, and Mr. Depew earned between $19.27 and $22.00 per hour. SPOKUS DEP. at 126; DEPEW DEP. at 109-110. From 2012-2013, Mobile, in accordance with then-existing company policy, paid Plaintiffs forty cents per mile for the commute to and from Sparrows Point and Blue Plains. SPOKUS DEP. at 127-128. However, Mobile changed this policy and ceased paying Plaintiffs for this commute because it was "too expensive." SPOKUS DEP. at 127-128. Other than this temporary forty cents per mile payment, Plaintiffs were not compensated for the time inspecting Mobile vehicles, loading and unloading the tools and equipment into the vehicles, and driving the vehicles between Sparrows Point and Blue Plains. SPOKUS DEP. at 146-147. Indeed, their hourly compensation was limited to the time spent actually spent at the Blue Plains facility. SPOKUS DEP. at 146-147.

---

[10] Mr. Spokus testified that their required start time at Blue Plains was 7:00 am, but Mr. Depew explained that they needed to be there by 6:45 am for a fifteen-minute briefing each morning. SPOKUS DEP. at 145.

Plaintiffs subsequently filed a complaint in this Court seeking compensation that they believe they were entitled to for time spent loading and unloading equipment and tools into Mobile vehicles, driving those vehicles to and from Sparrows Point and Blue Plains, and inspecting the vehicles daily. (ECF No. 1). Specifically, in their complaint, Plaintiffs plead six causes of action: (1) that Mobile violated the FLSA by failing to pay Plaintiffs overtime wages for time spent driving between Sparrows Point and Blue Plains; (2) that Carylon violated the FLSA by failing to pay Plaintiffs overtime wages for time spent driving between Sparrows Point and Blue Plains; (3) that Mobile violated MWHL by failing to pay Plaintiffs overtime wages for time spent driving between Sparrows Point and Blue Plains; (4) that Carylon violated MWHL by failing to pay Plaintiffs overtime wages for time spent driving between Sparrows Point and Blue Plains; (5) that Mobile violated MWPCL by failing to pay Plaintiff wages for time spent driving between Sparrows Point and Blue Plains; and (6) that Carylon violated MWPCL by failing to pay Plaintiff wages for time spent driving between Sparrows Point and Blue Plains. (ECF No. 1).

## II. Discussion

Defendants have presented this motion as a consolidation of both a motion for summary judgment and a motion to dismiss. However, in resolving the "motion to dismiss," the parties briefed, and the Court was required to consider, materials outside the pleadings, such as deposition testimony and affidavits. Therefore, Defendant's "motion to dismiss" will also be treated as a motion for summary judgment. See Pegues v. Wal-Mart Stores, Inc., 63 F. Supp. 3d 539, 542 (D. Md. 2014)("When reviewing a motion to dismiss, the court may consider documents attached to the complaint, as well as documents attached to the motion to dismiss, if they are integral to the complaint and their authenticity is not disputed. However, if the Court

considers matters outside the pleadings the Court must treat the motion as a motion for summary judgment") (internal citations, quotations, and brackets omitted).

Defendants' motion includes three arguments. First, they contend that they are entitled to judgment on all counts in the complaint because those counts are, according the Defendants, premised on the erroneous "legal conclusion that [Plaintiffs] are entitled to compensation for the time spent driving to and from Sparrows to Blue Plains." Specifically, Defendants argue that under the Portal-to-Portal Act, "[c]ommuting is the quintessential preliminary activity for which an employee is not owed wages under the FLSA," and simply because "Plaintiffs availed themselves of Mobile's trucks and drove the same to and from Blue Plains . . . does not make the time spent driving compensable under the FLSA, MWHL or MWPCL."[11] Second, as an alternative argument, Defendants contend that even if the Court finds that Plaintiffs' commuting time is compensable, the allegations set forth in Counts I-IV of the Complaint (those alleging violations of the FLSA and MWHL), nonetheless, fail as a matter of law because Plaintiffs fall within the Motor Carrier Act and therefore are exempt from overtime compensation under the FLSA and MWHL.[12] And third, Defendants contend that Carylon was not an employer under the FLSA, and as a result, Plaintiffs' causes of action against Carylon for unpaid wages (specifically, Counts II, IV, and VI of the Complaint) should fail.

---

[11] In arguing that they are entitled to judgment on all counts because commuting is not compensable under the FLSA, MWHL or MWPCL, Defendants only briefed on FLSA caselaw and provisions, presumably because they believed that the Maryland statutes were coextensive with the federal standard for all relevant purposes. When previously confronted with this issue, this Court has denied motions for summary judgment on the grounds that it was unclear whether the Maryland statutes were sufficiently comparable to the FLSA. See Jones v. Hoffberger Moving Servs. LLC, 92 F. Supp. 3d 405, 411, n.3 (D. Md. 2015) (where this Court denied the parties' cross motions for summary judgment on MWHL or MWPCL claims because the parties only briefed FLSA caselaw, and the Court was not convinced that those state claims were "perfectly aligned with the FLSA," in light of the United States Supreme Court's decision in Integrity Staffing Sols., Inc. v. Busk, 135 S. Ct. 513 (2014)). However, for the reasons explained in the body of this opinion, the Court need not reach this issue.

[12] Defendants explain, with supporting authority, why their FLSA analysis also applies to the MWHL counts as well. See Veney v. John W. Clarke, Inc., 28 F. Supp. 3d 435, 441 (D. Md. 2014) ("Consequently, if the [Motor Carrier Act] exemption defeats Plaintiffs' claim under the FLSA, then it will also defeat their state law claim to overtime compensation.").

Under Federal Rule of Civil Procedure 56, "the Court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "The burden is on the moving party to demonstrate the absence of any genuine dispute of material fact." Jones v. Hoffberger Moving Servs. LLC, 92 F. Supp. 3d 405, 409 (D. Md. 2015) (internal citations omitted). "In considering a motion for summary judgment, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Gbenoba v. Montgomery Cty. Dep't of Health & Human Servs., 209 F. Supp. 2d 572, 575 (D. Md. 2002) (internal citations and quotations omitted). "A dispute about a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "Thus, the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the nonmoving party on the evidence presented." Id. (brackets omitted). "In undertaking this inquiry, a court must view the facts and the reasonable inferences drawn therefrom in the light most favorable to the party opposing the motion but the opponent must bring forth evidence upon which a reasonable fact finder could rely." Id. "The mere existence of a *scintilla* of evidence in support of the nonmoving party's case is not sufficient to preclude an order granting summary judgment." Id. (emphasis in the original).

## A.  The FLSA and Portal-to-Portal Act

In 1938, Congress enacted the FLSA in order to "establish a federal minimum wage and to mandate that employees be compensated for overtime." Jones, 92 F. Supp. 3d at 409. "Within a decade, and in response to a flood of litigation," Congress enacted the Portal–to–Portal Act of 1947, 29 U.S.C. §§ 251–262. Id. (internal citations omitted). The Portal–to–Portal Act, which

amended the FLSA, exempts from compensation two types of activities that had previously been treated as compensable work. <u>Ross v. Wolf Fire Prot., Inc.</u>, 799 F. Supp. 2d 518, 523 (D. Md. 2011) (citing <u>IBP, Inc. v. Alvarez</u>, 546 U.S. 21, 25–26 (2005)). First, the act provides that "employers are not liable for an employee's time spent 'walking, riding, or traveling to and from the actual place of performance of the *principal activity or activities* which such employee is employed to perform.'" <u>Jones</u>, 92 F. Supp. 3d at 409 (citing 29 U.S.C. § 254(a)(1)) (emphasis added). And second, the act provides that "employers are not liable for an employee's time spent on "activities which are preliminary to or postliminary to said *principal activity or activities*, which occur either prior to the time on any particular workday at which such employee commences, or subsequent to the time on any particular workday at which he ceases, such *principal activity* or *activities*." <u>Id</u>. at 409–10 (citing 29 U.S.C. § 254(a)(1)) (emphasis added).

"To determine an employer's liability for unpaid wages and overtime, the key inquiry is whether such activities are properly labeled *principal activities* under the Portal–to–Portal Act." <u>Id</u>. at 409–10 (internal citations omitted) (emphasis added). The Supreme Court has clarified the term "principal activity" as "embrac[ing] all activities which are an *integral and indispensable* part of the principal activities." <u>Id</u>. (citing <u>Steiner v. Mitchell</u>, 350 U.S. 247, 252–53 (1956) (emphasis in the original).

After nearly sixty years of lower courts assigning various meanings and tests to this phrase,[13] the Supreme Court, in 2014, "revisited the meaning of *integral and indispensable*, and offered a more precise, albeit more restrictive, view." <u>Id</u>. (quotations omitted) (emphasis added). In <u>Integrity Staffing Sols., Inc. v. Busk</u>, 135 S. Ct. 513 (2014), the Supreme Court determined that the test for whether an activity is "integral and indispensable" is "tied to the productive work

---

[13] In so holding, the Supreme Court rejected tests avowed by other courts, including the Fourth Circuit, which focused on "whether an employer *required* a particular activity" or "whether the activity is for the *benefit* of the employer." <u>Jones</u>, 92 F. Supp. 3d at 410; <u>Integrity Staffing</u>, 135 S.Ct. at 519.

that the employee is *employed to perform.*" <u>Jones</u>, 92 F. Supp. 3d at 410 (citing <u>Integrity Staffing</u>, 135 S.Ct. at 519) (emphasis in the original). That is, "[a]n activity is only 'integral and indispensable' to the performance of an employee's principal activities if 'it is an intrinsic element of those activities and one with which the employee cannot dispense if he is to perform his principal activities.'" <u>Id</u>.[14]

Plaintiffs contend that Defendants violated the FLSA's overtime provisions by failing to compensate them for the time spent inspecting Mobile vehicles, driving those vehicles to and from Sparrows Point and Blue Plains, and loading and unloading the equipment and tools from the vehicles at those locations. (ECF No. 1). Accordingly, the question before the Court is whether these uncompensated activities—loading/unloading and inspecting Mobile vehicles and driving them to and from Sparrows Point and Blue Plains—were "integral and indispensable" to their employment with Mobile in the environmental waste cleanup process.

The question of "[w]hether an activity is preliminary or postliminary to principal activities for the purposes of § 254(a)(2) of the Portal–to–Portal Act is a mixed question of law and fact because the precise nature of the employee's duties is a question of fact, while application of the FLSA to those duties is a question of law." <u>Jones</u>, 92 F. Supp. 3d at 411 (citing <u>Baker v. Barnard Const. Co., Inc.</u>, 146 F.3d 1214, 1216 (10th Cir.1998)). In evaluating Defendants' motion for summary judgment, the Court will first assess "whether Plaintiffs'

---

[14] The Supreme Court, in <u>Integrity Staffing</u>, noted how this test would have been applied to similar cases that had previously been before the Court. See <u>Steiner v. Mitchell</u>, 350 U.S. 247 (1956) (employers were liable for time that plant employees spent showering and changing clothes after working with toxic materials); see also <u>Mitchell v. King Packing Co.</u>, 350 U.S. 260 (1956) (employers were liable for time that meatpacker employees spent sharpening knives). The Court in <u>Integrity Staffing</u> said that in both these cases, <u>Steiner</u> and <u>Mitchell</u>, employers cannot eliminate the disputed activity without impairing their employees' ability to work safely and efficiently. See <u>Integrity Staffing</u>, 135 S.Ct. at 518. In contrast, however, the Court did note that employers are not liable for time that poultry plant workers spend *waiting* to don and doff protective gear, <u>IBP</u>, 546 U.S. at 42, or for time that warehouse workers spend waiting in line to go through a post-shift security screening, <u>Integrity Staffing</u>, 135 S.Ct. 513. In these cases, an employer could dispose of the disputed activity without impairing their employees' ability to perform the work they were *employed to perform.* <u>Jones v. Hoffberger Moving Servs. LLC</u>, 92 F. Supp. 3d 405, 410 (D. Md. 2015).

allegations of unpaid work time are categorically exempt under the FLSA as a matter of law," and if the Court does not so find (that is, Plaintiffs' alleged unpaid work time *could* be considered a principal activity as a matter of law), then "the Court will consider whether there exist genuine issues of material fact such that judgment as a matter of law would be premature." Id.

As to this first assessment, the Court does not find that Plaintiffs' unpaid time is exempt as matter of law. Defendants argue, correctly, that time spent "commuting" is expressly exempted from the overtime requirement of the FLSA by § 254(a)(1) of the Portal–to–Portal Act. Indeed, the Fourth Circuit has held that this exemption applies even where employees are dependent on employer-provided transportation. See Ralph v. Tidewater Constr. Corp., 361 F.2d 806 (4th Cir.1966) (the Fourth Circuit held that a construction company, which had employed a group of engineers and ironworkers to build bridges and tunnels across the Chesapeake Bay, was exempt from liability under the Portal-to-Portal Act for their employees' travel time even though those employees "had to have transportation from the shore to their places of work in the Bay."). However, while these principles seem to categorically exempt time that is purely spent on commuting to and from work, they do not specifically address the Plaintiffs' contention that their "work each morning at Sparrows Point and their travel to Blue Plains was integral and indispensable to their job duties because they could not perform their work at Blue Plains without the tools and work equipment they transported." Two recent decisions from this Court provide guidance on this issue.

In Jones v. Hoffberger Moving Servs. LLC, 92 F. Supp. 3d 405 (D. Md. 2015), the defendant ("a commercial moving and storage company") required plaintiffs (employees who were primarily responsible for loading and unloading defendant's trucks), to travel to defendant's jobsites where they were paid hourly wages to move furniture, boxes and other

materials. <u>Id</u>. at 408. To help get plaintiffs to these jobsites, defendant offered a van service from one of its warehouses to the jobsite. <u>Id</u>. Plaintiffs were not required to use this service, and could instead opt for their own transportation to the jobsite, but if they did choose this service, they were required to arrive at the warehouse at an employer-specified time. <u>Id</u>.

This Court denied plaintiffs' claim, that they were entitled to compensation under the FLSA for the time spent traveling from the warehouse to the jobsite, stating that such time was exempt under the Portal-to-Portal Act as "no reasonable jury could find that plaintiffs were required to meet at the warehouse *to perform work."* <u>Id</u>. at 413. "Instead," the Court explained, "plaintiffs were only required to meet at the warehouse, if at all, to take advantage of defendants' van service." <u>Id</u>. at 413-14 (emphasis in the original). At the same time, the Court denied defendant's summary judgment motion for those workers who, prior to commuting, would load the defendant's trucks with moving equipment, stating that, pursuant to the so-called "continuous workday rule," employees performing such work would also be eligible to be paid for travel time subsequent to that work. <u>Id</u>.

In <u>Carrillo v. Borges Constr., LLC</u>, No. GJH-13-641, 2016 WL 5716186 (D. Md. Sept. 30, 2016), the plaintiffs were employed as day laborers for the defendant, a waterproofing construction contractor and subcontractor. Among other things, plaintiffs were required to arrive at defendants' place of businesses and load defendants' work trucks before proceeding to the specific jobsite, which could have been in Maryland, Virginia, or the District of Columbia. <u>Id</u>. at *1. And, at the end of their work duties at the jobsite, plaintiffs were required to drive defendants' equipment back to defendants' place of business and return the equipment to a secure location. <u>Id</u>.

In that case, this Court found that the time spent on these activities was "integral and indispensable to their principal activity as laborers and construction workers" and thus "should have been compensated accordingly." Id. at *4. The Court explained that the plaintiffs "were employed by defendants as day laborers and construction workers, work that could not been completed without access to the appropriate tools. Thus, the employers could not have disposed of the disputed activity, here the loading and unloading of equipment and tools; 'without impairing their employee's ability to perform the work they were employed to perform.'" Id. (citing Jones, 92 F. Supp. 3d at 410). Indeed, the Court in Carrillo went onto support this holding, noting that several other federal district courts, following the Supreme Court's decision in Integrity Staffing, "have held that similar preliminary equipment loading is considered 'integral and indispensable' to an employees' work activities." Id. at *1 (citing Gaytan v. G&G Landscaping Constr. Inc., 145 F. Supp. 3d 320. 325 (D.N.J. 2015)).

Here, the Court cannot say that the unpaid time is, as a matter of law, categorically exempt from compensation under the Portal-to-Portal Act. First, as Jones and Carrillo clearly show, time spent loading and unloading equipment and tools into employer vehicles (in this case, ten to thirty minutes per day), can be, under certain circumstances, "integral and indispensable" to an employee's work activities and, together with subsequent travel time, can therefore be compensable. There is no dispute that this equipment was then used at Blue Plains to perform the cleaning work.

Similarly the Court cannot say that Plaintiffs actions of inspecting Mobile vehicles and driving them to and from the jobsite were not "integral and indispensable" to their work responsibilities for Mobile, and thus exempt under the Portal-to-Portal Act. Mr. Depew and Mr. Spokus were, arguably, not using Mobile vehicles merely as a means of getting to the jobsite.

Rather, those vehicles were loaded with Mobile equipment (hoses, piping, fuel, oil, etc.), as instructed by their supervisor, that would have be used to complete the work at the Blue Plains facility. Additionally, some of the vehicles themselves appear to have had special functionality and, therefore, may have been used as "tools" at the Blue Plains facility to complete certain projects. Further, the inspection of these vehicles ensured their safe and effective operation and upkeep not just as commuting vehicles but as vehicles involved in the performance of the Blue Plains activities. Thus, similar to what this Court said in <u>Carrillo</u>, it is possible that "the employers could not have disposed of the disputed activity," here driving and inspecting the vehicles, "without impairing their employee's ability to perform the work they were employed to perform." Accordingly, the Court cannot categorically exempt this time as a matter of law.

As for the second assessment—the question of fact—the Court notes that there are several genuine disputes of material fact as to whether and to what extent the Mobile equipment and vehicles were, in fact, "integral and indispensable" to the Plaintiffs' jobs at Blue Plains. In support of their contention that such activities were "integral and indispensable," Plaintiffs rely, in part, on their deposition testimony in which they stated that, in accordance with their supervisor's instructions, they were "required" to load the equipment and fuel into a specified Mobile vehicle at Sparrows Point every day, drive the vehicle and equipment to Blue Plains, and then inspect the vehicle later in the day. DEPEW DEP. at 251; SPOKUS DEP. at 135-136.[15] And there is testimony from Plaintiffs and Mr. Smith indicating that some or all of the things that the brought to Blue Plains (the vehicles, tools, equipment, fuel, etc.) were needed to do the job. SMITH DEP. at 41, 45; DEPEW DEP. at 251.

---

[15] Although Plaintiffs do not expressly make this argument, the fact they were required to get their "CDLs" is supportive of their claim that bringing down these vehicles, equipment and fuel was required, and perhaps envisioned, by Mobile to perform the work at Blue Plains.

Defendants disagree. They contend that Plaintiffs' principal duties did not begin until Plaintiffs arrived at the Blue Plains facilities in the mornings. Defendants point out that there were already other vehicles and tools stored at the Blue Plains facility (SPOKUS DEP. at 69-70), and the vehicles at Sparrows Point were made available for Plaintiffs' benefit, evidenced by the fact that that arrangement did not occur until Mr. Spokus complained to his employer about the wear-and-tear on his personal vehicle (SPOKUS DEP. at 78-79; VETTER DEP. at 34). Further, Defendants argue that bringing down the fuel each day required minimal work as the fuel cell that carried the fuel was attached to one of the vehicles that Plaintiffs drove each morning. SMITH DEP. at 41. At the hearing on this motion, Defendants also argued that tools were only brought from Sparrows Point on an occasional basis, and only to replace tools that were otherwise onsite at Blue Plains

Clearly, these are competing factual claims that present a genuine dispute of material fact, as they go to the heart of whether and to what extent the uncompensated time was spent on activities that were "integral and indispensable" to Plaintiffs' work for Mobile. Therefore, the Court will reject this argument for summary judgment on the overtime claims because it is not for the Court to weigh those factual claims at this time. Gbenoba, 209 F. Supp. 2d at 575 ("In considering a motion for summary judgment, the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial") (internal citations and quotations omitted). As discussed immediately below, however, this does not completely resolve the FLSA and MWHL overtime issue.

### A.  Motor Carrier Exemption

As an alternative argument for summary judgment on the FLSA (and MWHL) overtime claims, Defendants argue that Plaintiffs are not entitled to overtime compensation because they

meet the requirements of the Motor Carrier Act exemption to the FLSA (and the MWHL). In determining whether this exemption applies, the Court is mindful that "exemptions to the FLSA are to be narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit." Hill v. B. Frank Joy, LLC, No. CV TDC-15-1120, 2016 WL 4194189, at *2 (D. Md. Aug. 9, 2016) internal citations and quotations omitted). And "[t]he burden of invoking these exemptions rests upon the employer," which, in this case, means that in order to hold that Defendants can rely upon the Motor Carrier Act exemption to avoid its compensation obligations, this Court must conclude that Defendants met their burden of showing "plainly and unmistakably" that Plaintiffs were working as private motor carriers. Rogers v. Sav. First Mortg., LLC, 362 F. Supp. 2d 624, 634–35 (D. Md. 2005).

Subject to some exemptions, "the FLSA requires employers to pay employees one-and-a-half times their regular pay rate for time worked in excess of 40 hours during a week." Hill, 2016 WL 4194189, at *2 (citing 29 U.S.C. § 207(a)(1)). One of the exemptions to the FLSA's overtime pay requirement, is the Motor Carrier Act exemption. Id. [16] This exemption "applies to any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of Title 49." Id. (citing § 213(b)(1)). [17] Under that provision, 49 U.S.C. § 31502, "the Secretary of

---

[16] Likewise, "the MWHL, which generally requires that each employer shall pay an overtime wage of at least 1.5 times the usual hourly wage, contains a similar exception." Hill v. B. Frank Joy, LLC, No. CV TDC-15-1120, 2016 WL 4194189, at *2 (D. Md. Aug. 9, 2016) (citing Md. Code Ann., Lab. & Empl. § 3-415(a), (c)(1); Veney v. John W. Clarke, Inc., 28 F. Supp. 3d 435, 441 (D. Md. 2014)).

[17] It appears that there is no dispute that Plaintiffs were subject to the Department of Transportation's jurisdiction. Not only do Plaintiffs fail to argue that they were not subject to this jurisdiction, but Mr. Depew testified at his deposition that the Mobile vehicles driven to and from Sparrows Point and Blue Plains were commercial vehicles, equipped with DOT license numbers. DEPEW DEP. at 136, 150-151. Vidinliev v. Carey Int'l, Inc., 581 F. Supp. 2d 1281, 1285 (N.D. Ga. 2008) ("Evidence that a carrier has a permit or license from the Department of Transportation is sufficient to prove jurisdiction") (internal citations omitted).

Transportation's authority to set qualifications and maximum hours extends to employees of 'motor carriers' and 'motor private carriers' operating in interstate commerce whose work affects the safety of operation of those carriers. Id. at *3 (citing 49 U.S.C. § 31502(b)).

Therefore, as a threshold matter, in order to meet the requirements of this exemption, Mobile would typically have to establish that (1) it is a "motor carrier" or "motor private carrier" operating in interstate commerce; and (2) that the Plaintiffs' worked as drivers, driver's helpers, loaders, or mechanics whose duties "affect the safety of operations." At the motions hearing, however, the parties agreed that the requirements of the Motor Carrier Act exemption were satisfied.[18] Nonetheless, Plaintiffs argue that even though the Motor Carrier Act exemption ostensibly applies, Plaintiffs would still preserve their ability to seek overtime compensation because they meet the vehicle weight criteria of the SAFTEA-LU Technical Corrections Act of 2008 ("Technical Corrections Act"), Pub. L. 110-244 § 306, 122 Stat. 1572, 1620 (2008)—or as this Court has previously called it, "an exception to the Motor Carrier exception." Hill, 2016 WL 4194189, at *3.

The Technical Corrections Act "relaxed the strict separation between the Secretary of Transportation's jurisdiction and the ambit of the Fair Labor Standards Act overtime guarantee by establishing that the FLSA overtime pay requirement applies to any covered employee of an employer otherwise subject to the Department of Transportation's jurisdiction" Id. (internal citations omitted). For purposes of the Technical Corrections Act, a "covered employee" is defined as an individual:

B. who is employed by a motor carrier or motor private carrier...;

---

[18] In recognizing the parties' agreement that the MCA requirements are met, the Court makes no independent finding in that regard, something that might prove difficult based on the record the parties have placed before the Court in their briefing.

C. whose work, in whole or in part, is defined—

    (A) as that of a driver, driver's helper, loader, or mechanic; and

    (B) as affecting the safety of operation of motor vehicles weighing 10,000 pounds or less in transportation on public highways in interstate or foreign commerce...; and

(3) who performs duties on motor vehicles weighing 10,000 pounds or less.

Hill, 2016 WL 4194189, at *3 (citing Technical Corrections Act § 306(c)).

    The criteria of the Technical Corrections Act in large part mirror those of the Motor Carrier Act exemption (that the parties agreed applied), with one important addition: the Technical Corrections Act only applies to activities involving vehicles weighing 10,000 pounds of less. Id. at *4; Technical Corrections Act § 306(c). Accordingly, the parties' agreement (that the requirements of the Motor Carrier Act exemption apply) leaves the question of whether the vehicles at issue weighed in excess of 10,000 pounds as the only remaining consideration before the Court. The parties further agreed that all the Mobile vehicles driven by Plaintiffs to and from Sparrows Point and Blue Plains, other than the Stakebody trucks, weighed more than 10,000 pounds.[19] As a result, in deciding whether the Technical Corrections Act applies, the sole focus of the Court is the weight of the Stakebody trucks.

    At his deposition, Mr. Spokus offered undecided testimony regarding the weight of this vehicle. At first, when asked if he knew the weight of these trucks, he responded "I don't know." SPOKUS DEP. at 91. Then later, during that same deposition, he clarified his earlier testimony, stating that they were over 5 tons in weight. SPOKUS DEP. at 106. And, Mr. Depew testified at his deposition that the weight of these vehicles was over 5,200 pounds, and later said that weight

---

[19] This agreement finds support in the record. Mr. Smith testified that that the "Guzzler" weighed 26,000 pounds. SMITH DEP. at 74. And Mr. Spokus testified that the vacuum tanker and the "Guzzler" each weighed 24,000 pounds, and that the "jetter truck" weighed at least 24,000 pounds. SPOKUS DEP. at 73.

was over 5,000 pounds. DEPEW DEP. at 132-133. Of course, a vehicle over 10,000 pounds is also over 5000 pounds. However, this factual ambiguity was resolved when Defendants presented an affidavit from Mr. Jerry Vetter, the President of Mobile, in which he states that the weight of these vehicles was 11,500 pounds based on the registered gross vehicle weight with the State of Pennsylvania where the vehicle was titled and registered. VETTER AFFIDAVIT at 3 (ECF No. 37-3). Because Plaintiffs have not presented any competent evidence that the Stakebody vehicles were 10,000 pounds or less, the Court finds that this element is satisfied.

In sum, because all the vehicles that Plaintiffs drove to and from Sparrows Point and Blue Plains were in excess of 10,000 pounds, the Court finds that the Technical Corrections Act does not apply, and, the parties having agreed that the Motor Carrier Act exemption otherwise applies, Plaintiffs cannot recover overtime compensation pursuant to the FLSA. This exemption also applies to Plaintiffs' alleged MWHL violations, see Veney v. John W. Clarke, Inc., 28 F. Supp. 3d 435, 441 (D. Md. 2014) ("Consequently, if the [Motor Carrier Act] exemption defeats Plaintiffs' claim under the FLSA, then it will also defeat their state law claim to overtime compensation."). Thus, judgment will be entered in Defendants' favor with regard to Counts I through IV of the Complaint. However, as the parties noted at the hearing, this finding does not preclude Plaintiffs from pursuing their regular hourly wage claims under the MWPCL against Mobile.

### C. Carylon Is Not an Employer

Under the FLSA, an "employer" is defined as "any person acting directly or indirectly in the interest of an employer in relation to an employee." Roman v. Guapos III, Inc., 970 F. Supp. 2d 407, 412–13 (D. Md. 2013) (citing 29 U.S.C. § 203(d)); see also Schultz v. Capital Int'l Sec., Inc., 466 F.3d 298, 304 (4th Cir. 2006)). In turn, an "employee" is defined under the FLSA as

"any individual employed by an employer," <u>Roman</u>, 970 F. Supp. 2d at 413 (citing 29 U.S.C. § 203(e)(1), and "employ" means "to suffer or permit to work." <u>Id</u>. (citing 29 U.S.C. § 203(g)). "Consistent with these broad definitions, the Supreme Court has instructed courts to construe the terms employer and employee expansively under the FLSA." <u>Id</u>. (internal citations and brackets omitted).

"Separate persons or entities that share control over an individual worker may be deemed joint employers under the FLSA." <u>Id</u>. (internal citations omitted). According to 29 C.F.R. § 791.2(b):

> Where the employee performs work which simultaneously benefits two or more employers, or works for two or more employers at different times during the workweek, a joint employment relationship generally will be considered to exist in situations such as:
>
> (1) Where there is an arrangement between the employers to share the employee's services, as, for example, to interchange employees;
>
> (2) Where one employer is acting directly or indirectly in the interest of the other employer (or employers) in relation to the employee; or
>
> (3) Where the employers are not completely disassociated with respect to the employment of a particular employee and may be deemed to share control of the employee, directly or indirectly, by reason of the fact that one employer controls, is controlled by, or is under common control with the other employer.

29 C.F.R. § 791.2(b).

"Where the alleged relationship does not fit readily into one of these three examples," as is this case here,[20] "courts are to consider the 'economic realities' of the relationship between the employee and the putative employer." <u>Roman</u>, 970 F. Supp. 2d at 413 (citing <u>Schultz</u>, 466 F.3d

---

[20] <u>In re Enter. Rent-A-Car Wage & Hour Employment Practices Litig.</u>, 683 F.3d 462, 469 (3d Cir. 2012)("the [economic] factors provide a useful analytical framework and may generally serve as the starting point for a district court's analysis, as they did here, especially in the parent-subsidiary context); <u>Roman v. Guapos III, Inc.</u>, 970 F. Supp. 2d 407, 414 (D. Md. 2013) ("in such a situation, the widely adopted [economic] realities test would be more appropriate to analyze whether the parent company was an 'employer'").

at 304). This Court has typically applied the following four factors: "(1) authority to hire and fire employees; (2) authority to supervise and control work schedules or employment conditions; (3) authority to determine the rate and method of payment; and (4) maintenance of employment records." Id. "While these factors are useful in examining the question, the determination of joint-employment must be based upon the circumstances of the whole activity." Id. (internal citations omitted). Although not briefed by the parties, the Court notes that these principles also apply with regards to whether Carylon was an employer for purposes of Plaintiffs' MWHL and MWPCL claims.[21]

Mr. Vetter, Mobile's President and 30(b)(6) designee for this case, and Mr. Mervis, General Counsel for Carylon, (MERVIS DEP. at 7), testified about the relationship between Mobile, Carylon, and Plaintiffs, and in evaluating that testimony along with the four factors above, it is clear to the Court that Carylon is not the employer of Plaintiffs within the meaning of the FLSA.

The first two of these factors—the authority to hire and fire employees, and the authority to supervise and control work schedules or employment conditions—strongly weigh in favor of Mobile as the sole employer for the purposes of the FLSA. Carylon was not involved in the day-to-day operations of Mobile. VETTER DEP. at 18. The extent of Carylon's communications with Mobile was to "develop the overall corporate policies and guidance," which included policies relating to "employee guidelines [and] corporate benefits." VETTER DEP. at 18.[22] The day-to-day

---

[21] As recognized by this Court in Reynolds v. Solo & AD, Inc., No. CV CBD-15-2021, 2015 WL 5882053 (D. Md. Oct. 2, 2015) and Watkins v. Brown, 173 F. Supp. 2d 409 (D. Md. 2001), the term "employer" is not defined the same way among these three statutes. Specifically, MWPCL defines "employer" in a way that is more restrictive than the definition in the FLSA and the MWHL. Reynolds, 2015 WL 5882053, at *3. The Maryland Court of Special Appeals, recognizing this difference, has nonetheless held that the same economic realities test applies to the MWPCL. Campusano v. Lusitano Construction, LLC, 56 A.3d 303 (Md. App. 2012).

[22] Mr. Vetter did note, however, that Carylon would get involved if there was a local issue that Mobile could not resolve itself, but he did not specify in detail what that would entail. VETTER DEP. at 18.

management and control of Plaintiffs, and other workers at Blue Plains, during the relevant time period, was left to Mr. Smith, a Mobile employee and supervisor. Vetter Dep. at 36. Mr. Mervis stated that Carylon, at most, had the authority to hire and fire managers and assistant managers of Mobile, otherwise Carylon did not exercise such authority. Mervis Dep. at 25. Carylon did not establish any employee practices for Mobile, Carylon did not create or impose any overtime compensation policies for Mobile, and Carylon did not control the scheduling of Mobile's employees. Mervis Dep. at 25, 30, 33, 37.

Similarly, as it relates to the remaining two factors—the authority to determine the rate/method of payment, and the maintenance of employee records—the Court notes that Carylon's bookkeeper did no accounting or bookkeeping for Mobile. Mervis Dep. at 15. And, Carylon did not have any involvement in Mobile's payroll, nor did it have possession of any subsidiary employees' time sheets, including Plaintiffs' time sheets. Mervis Dep. at 15, 24, 28 30-34. Accordingly, these factors also weigh in support Defendants' claim that Carylon was not an employer of Plaintiffs for purposes of the FLSA.

Plaintiffs rely on the corporate policy and guidelines that Carylon produced, as evidence that the corporation had sufficient control over its subsidiaries so as to qualify as an employer under the FLSA. But in In re Enter. Rent-A-Car, the Court considered this exact type of evidence and assigned it little weight, noting that there was little evidence that these policies and guidelines actually exerted control over the subsidiaries. 683 F.3d at 471. Similarly, here, even with these guidelines and policies in place, Carylon did not have any control over the hiring and retention of Mobile operators and laborers, Carylon did not involve itself with employee payment or records, and Carylon did not have any influence in the day to day operations of Mobile.

**III. Conclusion**

For the foregoing reasons, Defendants' motion is GRANTED as to Counts I through IV and Count VI of the Complaint, but DENIED as to Count V of the Complaint.  A separate order shall follow.

Dated: April 18, 2017

_____/s/_____
J. Mark Coulson
United States Magistrate Judge